**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **LYNN GRANT**<br>5112 Celtic Drive, Apt. 103<br>Alexandria, VA 22310<br><br>and<br><br>**ERIKA ERVIN,**<br>3714 29th Street<br>Chesapeake Beach, MD 20732<br><br>       Plaintiffs,<br><br>v.<br><br>**PRINCE GEORGE'S COUNTY,<br>MARYLAND**<br><u>Serve:</u><br>Rhonda L. Weaver, Esq.<br>Prince George's County Attorney<br>1301 McCormick Drive, Suite 4100<br>Largo, MD 20774<br><br>**HENRY P. STAWINSKI, III,**<br>6510 40th Ave<br>University Park, MD 20782<br><br>and<br><br>**HECTOR VELEZ**<br>8971 Tawes St<br>Fulton, MD 20759<br><br>       Defendants. | **Case No.:**_____ |

## COMPLAINT AND JURY DEMAND

      Plaintiffs Lynn Grant and Erika Ervin, through the undersigned counsel, sue Defendants

Prince George's County Maryland; Henry P. Stawinski, III; and Hector Velez, and state as

follows:

1

## JURISDICTION AND VENUE

1.      The events giving rise to this action occurred in Prince George's County, Maryland, and all defendants reside in Maryland. Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2).

2.      This action for unlawful discrimination is brought pursuant to 42 U.S.C. § 1981. Jurisdiction is proper pursuant to 28 U.S.C. § 1331.

3.      The amount in controversy as set forth in the complaint exceeds $75,000.00 in an amount to be determined by the jury.

## PARTIES

4.      Plaintiff Lynn Grant is an African-American female adult resident of Prince George's County, Maryland. She has been employed by defendant Prince George's County, Maryland since 1999 as an officer of the Prince George's County Police Department ("PGPD"). Plaintiff Grant was hired as a Police Officer, and has served as a Sergeant since 2010.

5.      Plaintiff Erika Ervin is an African-American female adult resident of Prince George's County, Maryland. She has been employed by defendant Prince George's County, Maryland since 2002 as an officer of the PGPD.

6.      Defendant Price George's County, Maryland (the "County") is a municipal corporation organized under Article XI of the Maryland Constitution. The County organizes, operates, and maintains the PGPD, the primary law enforcement agency in the County.  The terms "PGPD" and "County" are used interchangeably throughout this Complaint, and refer to the employer.  At all relevant times to this Complaint, the County employed Plaintiffs and defendants Henry P. Stawinski III and Hector Velez.

7.      Defendant Henry P. Stawinski, III ("Stawinski") is a White male adult resident of Maryland.  Stawinski was the Chief of Police of the PGPD from on or around February 2016 through on or around June 2020.  At all relevant times, Stawinski was an employee of the County.  Stawinski knew or should have known of the discriminatory conduct, policies, practices, of the Defendants described herein, and he condoned, ratified, authorized and/or engaged in such conduct.  He is sued here in his individual capacity.

8.      Defendant Hector Velez ("Velez") is a Hispanic male adult resident of Maryland. Velez was the Interim Chief of Police of the PGPD from on or around June 2020 through on or around May 2021.  At all relevant times, Velez was an employee of the County.  Velez knew or should have known of the discriminatory conduct, policies, practices, of the Defendants described herein, and he condoned, ratified, authorized and/or engaged in such conduct.  He is sued here in his individual capacity.

## FACTS COMMON TO ALL COUNTS

**A.  Discrimination in the Prince George's County Police Department.**

9.      Prince George's County, Maryland is the second-most populous county in Maryland. It is one of the largest and most affluent majority-Black counties in the United States. Its population is estimated to be approximately 64 percent Black, 20 percent Hispanic, 12 percent non-Hispanic white, and 4 percent Asian-American.

10.      Within the PGPD, as of July 2020, 43 percent of officers are white, 43 percent are Black, 11 percent are Hispanic, and 4 percent are Asian-American or Pacific Islander.

11.     White officers are disproportionately overrepresented in the PGPD's upper ranks. According to findings in an ongoing lawsuit in this Court, white officers currently make up over 50% of sergeants, over 60% of lieutenants, and over 80% of captains in the PGPD.

12.     This disproportionate representation has existed for years, and is the result of a pattern and practice of discriminatory hiring and promotion by the PGPD, including during the time that the PGPD was led by defendants Stawinski III and Velez.

13.     Plaintiffs are informed and believe, and herein allege that although the PGPD is aware of the racial disparities in its leadership corps, it has refused to take steps to rectify the concerns of Black and Hispanic officers. This refusal led to the filing of a case in this Court captioned *Hispanic National Law Enforcement Association NCR et al. v. Prince George's County et al.*, Case No. 8:18-cv-03821-TDC (the "HNLEA Case").

14.     Recently, the Honorable Theodore Chuang granted preliminary injunctive relief to the plaintiffs in the HNLEA Case, finding that "PGPD promotion tests and processes have an adverse impact on Black and Hispanic officers seeking promotion, which has resulted in significant underrepresentation of such officers at the higher ranks of the PGPD."

15.     In his memorandum opinion (ECF 503 in the HNLEA Case) the Honorable Judge Chuang noted that for "promotion to Lieutenant, the promotion rates for both Black and Hispanic officers were lower than for white officers in both 2016 and 2018.  The lower rates for Black officers were of practical significance in both cycles and of statistical significance in 2016 only. Thus, for Black officers, across the two Sergeant and two Lieutenant promotion processes, all four of the promotion cycles either failed the 4/5ths Rule, showed statistically significant results, or both."  As explained in his opinion, "the 'fourt-fifths rule" uses the "adverse impact ratio," a concept grounded in a federal regulation which applies a presumption that a selection process has

an 'adverse impact' when the data shows that individuals of a particular race or other protected class are hired, promoted, or otherwise selected at a rate that is below four-fifths, or 80 percent, of the rate at which members of the comparison group—in this case, white officers—are selected. See 29 C.F.R. 1607.4(D) (2020).  As relevant here, if under this methodology the promotion rate of Black or Hispanic officers is less than 80 percent of the promotion rate of white officers, the difference in promotion rates is deemed to be of 'practical significance.'" (*Id.* at p. 8-9).

16.     This underrepresentation was not merely the adverse impact of the discriminatory testing system—it was the result of intentional discrimination and deliberate indifference to the racial disparities in leadership.

17.     Plaintiffs are informed and believe, and herein allege that PGPD leadership, including, but not limited to defendants Stawinski III and/or Velez, have been aware of the racial disparities in its leadership since at least 2012, but failed to take any remedial measures. Plaintiffs are informed and believe and herein allege that PGPD has been generating annual reports regarding the racial makeup of officers and supervisors at each level throughout this time, but that nothing has been done to remedy the discriminatory impact on Plaintiffs or other Black officers.

18.     In October 2016, HNLEA and the United Black Police Officers Association (UBPOA) filed a complaint with the United States Department of Justice (DOJ) requesting that the DOJ review discrimination within the PGPD, including denial or delay of promotions.  As a result, in 2017, the PGPD convened a panel on equality, which identified "several possible problems with the existing promotion system."  These included PGPD's use of predominantly white "subject matter experts" (SMEs) in the promotion test process, which led to SMEs sharing

information with their predominantly white friends on the police force, giving those white

officers a disproportionate advantage on exams.  It also noted the disproportionate assignment of

white officers to specialty units, which provided those officers with additional time to study, and

engage in skills, training, and experience on topics assessed during the promotion exam, thereby

perpetuating the disproportionate promotion of white officers and reinforcing the existing

dynamic.

19.     Despite these findings, the panel was disbanded without any changes being made.

Despite the HNLEA and UBPOA again asking for a review of these discriminatory practices in

2020, Plaintiffs are informed and believe, and herein allege, that the PGPD never took any steps

to modify its promotional processes.

20.     Plaintiffs are also informed and believe, and herein allege, that white PGPD

officers have also engaged in repeated severe or pervasive, unwanted, hostile, abusive, and racist

behavior including, but not limited to:

      a.     A white officer told Plaintiff Ervin that the only reason that she was selected
for a position was because she was a "black female."  That same officer asked
Plaintiff Ervin if she wanted to "ride the white pony," referencing having sex
with him because he was white.

      b.     A white supervising officer Plaintiff Ervin asked her if he could touch her
hair.  Shocked, Plaintiff Ervin agreed reluctantly because it was her
supervisor.  When he touched her hair, he replied, "that feels like petting a
dog," or words to that effect, and then asked if her hair would "turn into an
afro" if she "poured water on it," or words to that effect.

c. Referring to People of Color in the community as "niggxxs," "single 7s [code for a suspicious person]," "Mike Mike and Jo Jo" referring to Black men, or "Esse" for a Hispanic person;

d. Plaintiff Grant heard that white officers referred to other PGPD officers as "monkey," and "baboon," and "single 7;"

e. Plaintiff Ervin heard that a Black officer was called an "ape" or "gorilla" by white officers;

f. Giving a training dummy black face and an afro wig and referring to all criminals as "bad Blacks;"

g. Plaintiff Ervin heard white officers refer to the Community Oriented Policing program as a "hug-a-thug" to refer to being nice to Black members of the community;

h. Plaintiff Ervin heard about text messages by white officers that referenced a desire to reinstitute lynching;

i. Plaintiff Ervin heard white officers refer to communities of color as "shitholes," and "ghettos;"

j. This is a non-exhaustive list of examples of the racist behavior tolerated by PGPD.

21.     Plaintiffs are informed and believe, and herein allege that Defendants knew or should have known about the racist, hostile and abusive environment, but failed to take steps to prevent or correct the harassment and discrimination.  Rather, Plaintiffs are informed and believe, and herein allege that Defendants failed to implement appropriate discipline, continued to retain officers despite their knowledge of such egregious conduct, and in some instances

promoted such officers despite such complaints of this racist conduct.  Plaintiffs are informed

and believe, and herein allege that officers, including Plaintiffs, on the other hand, were

retaliated against and disproportionately disciplined for their lawful complaints of

discrimination.

22.     Assessing the discrimination claims in the HNLEA case, Judge Chuang found that

"there are sufficient disparities to conclude that the PGPD promotion process has an adverse

impact on Black and Hispanic officers seeking promotion to the ranks from POFC [Police

Officer First Class] to Lieutenant." Judge Chuang further found that "the notable adverse impact

on Black and Hispanic officers at each identified promotion level contributes to

underrepresentation at higher ranks as the universe of officers eligible for promotions becomes

less and less diverse, with the result that PGPD has significant underrepresentation of Black and

Hispanic officers at the more senior positions."

23.     Judge Chuang also noted that "PGPD's promotion process apparently does not

consider in any way . . . whether an officer with a discriminatory animus should be placed in a

command position" and "PGPD has actually promoted officers who have exhibited egregious

racially discriminatory animus."

24.     Given these facts, Judge Chuang found that the "evidence demonstrates that

PGPD has been aware of the significant disparities in promotion rates based on race dating back

at least to 2012 but has done virtually nothing to address them," noting that "Chief Stawinski

effectively let the 2017 Panel die without issuing a report and did not task anyone else to address

the issues," and that a work group put together in 2020, "even when confronted with the issue of

discrimination in the promotion process, did nothing to address it."

25.     Judge Chuang further concluded that "the statistical evidence of longstanding adverse impact, the evidence of deliberate indifference to those disparities, and the additional evidence on both the operation of the promotion process and the broader operations of PGPD establish that" the plaintiffs in that case demonstrated a likelihood of success on the merits of their claims alleging pervasive and ongoing discrimination against officers of color.

26.     Plaintiffs Lynn Grant and Erika Ervin have been victims of the same PGPD pattern and practice of discriminatory behavior and hostile work environment.

**B.  Sergeant Lynn Grant.**

27.     Sergeant Grant was hired by the PGPD on or about December 6, 1999 as a police officer.

28.     Over the years, Sergeant Grant rose to the rank of sergeant in around 2010. In around January 2011 Sergeant Grant was assigned to the Bureau of Investigation/Criminal Investigation Division ("BOI/CID") where she served with the FBI Baltimore Field Office's Public Corruption Unit as a PGPD Task Force Officer.

29.      In around August 2013, Sergeant Grant was assigned to the FBI's Cross-Border Task Force, a unit responsible for cooperating with federal law enforcement on gang activity in Prince George's County.

30.     Sergeant Grant served on FBI Task Force assignments for approximately six years. During each of those six years—as she had during the prior twelve—Sergeant Grant received outstanding performance evaluations. She never received any counseling for disciplinary or performance issues.

31.     On around August 25, 2017, Sergeant Grant's supervising officer, Major Anthony Schartner, suddenly informed Sergeant Grant that she was being removed from the FBI Task Force and reassigned to the Bureau of Forensic Science ("BFS").

32.     The BFS position was inferior to the FBI Task Force positions that Sergeant Grant previously held. Her duties at BFS consisted primarily of collecting mail, distributing court summonses, and providing building escorts. These duties could and should have been handled by an officer well below Sergeant Grant's level of experience and skill set.

33.     Moreover, the BFS position offered many fewer opportunities for overtime work, thereby reducing Sergeant Grant's take-home pay by approximately $18,000 per year.

34.     Sergeant Grant was surprised and upset by the transfer, given her excellent performance record and the fact that, at the time of the transfer, she was the only minority female supervisor in the PGPD serving on a federal task force.

35.     Sergeant Grant asked Major Schartner why she was being removed from the FBI Task Force and why she was being reassigned to a less prestigious bureau.

36.     Major Schartner gave Sergeant Grant vague and contradictory explanations, including that the FBI had "said there were too many supervisors in the Task Force" and that the PGPD was "restructuring" the Task Force, or words to that effect.

37.     Major Schartner was unable to explain, however, why Sergeant Grant was transferred to the BFS, as there were at least three open sergeant positions within the BOI at that time, all of which Sergeant Grant would have been qualified for.

38.     Eventually, Major Schartner told Sergeant Grant that the situation was "fucked up" but that it was "out of [his] hands."

39.     Sergeant Grant was forced to accept the transfer, as she wanted to remain with the PGPD. After her transfer, multiple officers and supervisors made jokes as they passed her in the hallway about her being transferred to BFS.

40.     Nevertheless, Sergeant Grant hoped to get back into the FBI Task Force, where she felt that her skills, training, and experience were most valuable.

41.     Due to the PGPD's discriminatory hiring and promotional practices, however, Sergeant Grant was denied several opportunities.

42.     On April 29, 2018, Sergeant Grant tested for the rank of lieutenant during the scheduled promotional examination.

43.     Plaintiff Grant is informed and believes, and herein alleges that in around September 2018 a position became available with the FBI Task Force.  Sergeant Grant was not informed about the open position.

44.     The PGPD did not offer the position or an opportunity to apply to Sergeant Grant, despite her six-year record of outstanding performance on the FBI Task Force.

45.     Sergeant Grant is informed and believes that PGPD filled the position with a white male sergeant.

46.     Additionally, on or around late 2018, Lieutenant Horne was working in the Internal Affairs Division ("IAD"). Sergeant Grant is informed and believes that Lieutenant Horne recommended her for a position in IAD, as she had worked in conjunction with the IAD during her time on the FBI Task Force's Public Corruption Squad.

47.     Sergeant Grant is informed and believes that Lieutenant Horne was told that it would be "difficult to get" Sergeant Grant into the IAD position. She was never offered the job.

48.     On September 5, 2018, she learned that she ranked 44 out of 113 on the promotional eligibility list.

49.     On September 18 and November 6, 2018, Sergeant Grant applied for two open positions on the FBI Task Force.

50.     Sergeant Grant was among the most qualified applicants for the position, given her prior time on the Task Force and the fact that, at that time, her Top Secret clearance was still active.

51.     Despite Sergeant Grant's qualifications, both vacant positions were filled by white men—Sergeant Kenneth Doyle, and Sergeant Joseph Bellino.

52.     Plaintiff is informed and believes and herein alleges that both of the white men who were promoted ahead of Sergeant Grant had less time and experience at the rank of sergeant, and neither had the experience on a federal task force that Sergeant Grant possessed.

53.     There was no non-discriminatory explanation for the decision to hire Sergeant Doyle and Sergeant Bellino to the FBI Task Force, while leaving Sergeant Grant at BFS.

54.     In response to the PGPD's discriminatory refusal to transfer Sergeant Grant to the FBI task Force, Sergeant Grant filed a grievance with the County on February 12, 2019, referencing both her forced transfer to BFS and the PGPD's refusal to consider her for the subsequent positions.

55.     Two days later, then-Deputy Chief and EEO Coordinator Melvin Powell stopped Sergeant Grant in the hallway. Deputy Chief Powell told Sergeant Grant that she had been transferred from the FBI Task Force in 2017 because the FBI had wanted her off the team. Deputy Chief Powell refused to provide the name of the person who had supposedly told him this information.

12

56.     Sergeant Grant pointed out that when she had been transferred, she had been given entirely different reasons for the transfer. She also informed him that her former supervisor had requested her return to the FBI Task Force.

57.     In response, Deputy Chief Powell did not address the contradictory reasons for her transfer or provide any additional information. Instead, he claimed that she had "missed the deadline" for filing the grievance, because she had referenced matters that occurred in 2017 and therefore had missed the EEO timeline.  Sergeant Grant stated that the EEO timeline would begin, at the latest, in September 2018, when she submitted the transfer requests to return to the FBI Task Force. Deputy Chief Power told her that they would "discuss it later" and walked away.

58.     Plaintiff Grant is informed and believes, and herein alleges that no steps were taken to investigate her complaint and/or otherwise prevent or correct the discrimination.

59.     On February 26, 2019, Deputy Chief Powell saw Sergeant Grant in the hallway, and told her that he was closing out her case because she had "missed the deadline." She was never given the opportunity to have a formal meeting with Deputy Chief Powell or the other EEO Coordinator, Jewel Graves.

60.     On March 1, 2019, then-Acting Deputy Chief Harvin called Sergeant Grant to his office, where she met with him and Deputy Chief Powell. Deputy Chief Powell provided her with a letter to sign stating that her complaint was not lodged within the requisite time frame. Sergeant Grant refused to sign the letter, as her complaint had been timely filed, she was never notified of a mediation meeting, and the parties had never discussed her actual grievance.

61.     Deputy Chief Powell then claimed her grievance was formatted incorrectly. Sergeant Grant responded that had they met, she could have easily formatted the complaint to

meet any necessary standards. At this, Deputy Chief Powell became upset, raising his voice and claiming again that the FBI had wanted her removed from the Task Force. Again, he provided no further details of this supposed "request."

62.     On March 4, 2019, Sergeant Grant filed a Charge of Discrimination with the EEOC, regarding the discrimination.

63.     Following Plaintiff Grant's complaint to the EEOC, Defendants retaliated against her and continued to refuse to promote her despite her eligibility.

64.     During the pendency of the EEOC charge, Sergeant Grant continued her efforts to obtain a promotion.

65.     The PGPD has had a practice, but not a written policy, that the promotional eligibility list from each test expires 60 days prior to the next test. Because Sergeant Grant had passed the April 2018 promotional eligibility examination, her eligibility would have "expired" under the PGPD's practice on February 26, 2020, 60 days before the next examination, which was scheduled for April 26, 2020.

66.     Sergeant Grant signed up to take the April 26, 2020 exam so that she could remain on the promotional eligibility list.

67.     On April 13, 2020, the promotional examination was postponed due to the COVID-19 pandemic.

68.     Plaintiffs are informed and believe and herein allege that the "expiration" of eligibility lists is merely a practice and has never been promulgated as an actual policy.

69.     Despite this, although Sergeant Grant passed the promotional exam, and could not take another exam, she and other affected officers were informed that they were not eligible for promotion.

70.     Plaintiffs are informed and believe and herein allege that most of the affected officers were Black or Hispanic.

71.     As the test had been postponed and there was no written or required expiration date for eligibility, Sergeant Grant believed that the 2018 eligibility register was still in effect, and those who had passed the 2018 test were still eligible for promotion.

72.      On or about June 18, 2020 Michael Graham, a former Los Angeles County Sheriff's Department Assistant Sheriff acting as an expert in police practices in the HNLEA Case, issued a report showing that for years, PGPD engaged in discriminatory hiring and promotion practices, resulting in a massive disparity in the racial makeup of PGPD leadership.

73.     Plaintiffs are informed and believe, and herein allege that Chief Stawinski retired almost immediately after the report was released.

74.     Plaintiffs are informed and believe, and herein allege that defendant Velez has also resigned and/or retired on or around early May 2021 and was replaced by Chief Malik Aziz.

75.     The report made clear what Sergeant Grant and the other affected officers asserted: The decision to declare their passing grades "expired" while refusing to permit them any other means of obtaining a promotion was motivated not by any practical concern about the officers' qualifications, but by a desire to avoid promoting the mostly Black and Hispanic officers, including Sergeant Grant, to leadership positions.

76.     On or around August 13, 2020, Chief Velez was asked at the Police Reform Panel meeting whether the officers were promoted and he said it was "out of his hands."

77.     On or around January 4, 2021, Sergeant Grant submitted an internal complaint regarding the discriminatory treatment. On March 17, 2021, Deputy Chief Lakina Webster, the PGPD's EEO Coordinator, responded in a letter stating that the PGPD's "actions were consistent

with past practices" and her "complaint did not rise to the level of EEO."  Deputy Chief Webster

claimed that despite the extensive and public evidence of systematic discrimination within the

PGPD, "There is no evidence that [Sergeant Grant was] subjected to discriminatory practices

based on [her] race and gender."

78.     On January 27, 2021, Sergeant Grant filed a complaint with the EEOC.

79.     To date, PGPD has failed to promote Sergeant Grant.

**C.  Erika Ervin.**

80.     Like Sergeant Grant, Sergeant Erika Ervin has been with the PGPD for many

years, first joining the department in October 2002. In January 2003, Sergeant Ervin was one of

the first two female officers assigned to an intensity crime suppression squad.  She was promoted

to corporal in 2007, became a hostage negotiator with the District II Conflict Management Team

in 2010, and was promoted to her current rank of sergeant in December 2012, after which she

remained in the same unit.

81.     Sergeant Ervin's performance in that role was excellent. She was praised by her

superiors on several occasions and had twice received Commanders' Awards.

82.     In April 2016, Sergeant Ervin took the promotional test. She failed by only three

points—in a test now recognized to have been applied in a discriminatory fashion—and wrote

appeals regarding the decision against her.

83.     Around this same time, Sergeant Ervin's squad came under the command of a

new white lieutenant, Jason Rorick.

84.     Sergeant Ervin had previously been warned about Lieutenant Rorick.  She was

told to "be careful of" him, because he was known to have an issue with minorities, especially

Black women.

85.     After Sergeant Ervin finished writing her appeals regarding the discriminatory test, Lieutenant Rorick offered to "help" her write the appeals.  Sergeant Ervin politely declined. Lieutenant Rorick then asked if he could read the appeals. When Sergeant Ervin provided her appeals to him to read, Lieutenant Rorick asked Sergeant Ervin who had "helped" her write the appeals—suggesting that Sergeant Ervin was not intelligent enough to have written the appeals on her own.  Sergeant Ervin found this question highly offensive.

86.     After this incident, Lieutenant Rorick worked to undermine Sergeant Ervin, cutting her out of decisions regarding the squad and working directly with one of the white male corporals under her command, which prevented her from effectively supervising her squad.

87.     In October 2016, Sergeant Ervin was informed that she was being transferred to District VI. She was never given any kind of explanation for the transfer; when she asked, she was told only that District VI "needed a sergeant."

88.     On information and belief, Sergeant Ervin was transferred to District VI at the request of Lieutenant Rorick because he did not want to work with a Black woman.

89.     Indeed, shortly after Sergeant Ervin's transfer, in December 2016, Lieutenant Rorick got into a public heated exchange with a Black female lieutenant during a County-sponsored holiday event.  Plaintiffs are informed and believe, and herein allege that he was transferred to the Community Services Division shortly thereafter.  Although Lieutenant Rorick was in that position for less than a year, during that time he transferred the only Spanish-speaking Latino officer out of the Division, as well as a Black officer whom Lieutenant Rorick subsequently replaced with a white male.

90.     In November 2017, Sergeant Ervin was transferred to the Training and Education Division as an Administrative Sergeant.

91.     In April 2018, Sergeant Ervin took the promotional exam and passed, scoring an 85 on both the written and practical portions, ranking 45 on the list.  However, she was never promoted to lieutenant.

92.     Like Sergeant Grant, Sergeant Ervin registered for the April 2020 promotion eligibility exam so that she would remain eligible.

93.     Sergeant Ervin never received a promotion despite being eligible.

94.     In the fall of 2020, another promotion eligibility exam was offered, and Sergeant Ervin registered, initially intending to take the exam.

95.     However, the exam was only available in-person, and carried a high risk of contracting COVID-19, and as a result Sergeant Ervin did not take that exam.

96.     Sergeant Ervin still has not been promoted to the position of Lieutenant.

## COUNT I
**42 U.S.C. § 1981 – Racial Discrimination in Employment**
**(All Plaintiffs v. All Defendants)**

97.     Plaintiffs incorporate and re-allege the foregoing paragraphs as if fully set forth herein.

98.     At all relevant times hereto, Defendants Stawinski and Velez were directly involved in the maintenance and promulgation of all promotion procedures, and was ultimately responsible for the nature of those procedures.

99.     As described above, Defendants knowingly and intentionally maintained a racially discriminatory set of hiring practices that resulted in Black officers like Plaintiffs being offered fewer opportunities for promotion when compared to white officers with similar skills, experience, and performance. The maintenance of these practices was intended to, and did, result

in disproportionately white leadership within the PGPD to the detriment of qualified Black officers.

100.    Throughout their employment with Defendants, Plaintiffs were subjected to discriminatory adverse employment actions because of their race.  Such adverse employment actions include, but are not limited to:

a.    Defendants' demotion of Sergeant Grant from her position on the FBI Taskforce to BFS in or around August 25, 2017;

b.    Defendants' failure to allow Sergeant Grant the opportunity to apply for and/or be promoted back onto the FBI Taskforce after a position became available, instead giving the position to a white male officer;

c.    Defendants' refusal to promote Sergeant Grant to the FBI Taskforce in 2018 after Sergeant Grant applied for two separate open positions.  Defendants gave both positions to white men.

d.    Defendants' discriminatory and retaliatory transfer of Sergeant Ervin in around November 2017.

e.    Defendants refused to promote both Plaintiffs after they became eligible in 2018, and removed them from the eligibility roster for promotion in 2020 without any reasonable justification for doing so.

101.    When Plaintiffs complained that their removal from the eligibility roster was discriminatory and primarily disadvantaged Black and Hispanic officers, including Plaintiffs, Defendants refused to take any steps to reinstate Plaintiffs' eligibility for promotion.

102.    Moreover, even when Defendants did provide another opportunity for Plaintiffs to become promotion-eligible, it was using the same processes and procedures that Defendants

knew to be discriminatory, thus ensuring that Plaintiffs, if they took the exam, would be at an unfair disadvantage due to their race.

103.   Defendants' maintenance of discriminatory hiring practices, refusal to promote Plaintiffs, removal of Plaintiffs from the eligibility roster, refusal to reinstate Plaintiffs' eligibility, and refusal to provide a non-discriminatory means of become promotion-eligible constitute adverse employment actions.

104.   Defendants took the aforementioned discriminatory and adverse employment actions because of Plaintiffs' race.

105.   As a direct and proximate result of Defendants conduct, Plaintiffs were harmed and suffered damages, including but not limited to mental and emotional distress, loss of income, loss of reputation and economic damages.

WHEREFORE, Plaintiffs demand the following relief:

a.   That the Court enter Judgment against Defendants Prince George's County, Henry P. Stawinski, III, and Hector Velez, and in favor of Plaintiffs;

b.    That the court award Plaintiffs back pay, front pay, compensatory damages plus interest in an amount to be proven at trial;

c.   That the Court award Plaintiffs their reasonable attorney's fees and costs incurred in this action;

d.   Injunctive relief requiring Prince George's County to promote both Plaintiffs to the rank of Lieutenant; and

e.   Such other and further relief as the Court deems just and proper under the circumstances.

## JURY DEMAND

Plaintiffs demand a trial by jury of all claims so triable.

_____/s/_____
Jay P. Holland

Respectfully submitted this 24th day of August, 2021.

JOSEPH, GREENWALD & LAAKE, P.A.

_____/s/_____
Jay P. Holland – Federal Bar #06015
Erika Jacobsen White - Federal Bar #21815
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770
(301) 220-2200 (tel.)
(301) 220-1214 (fax)
jholland@jgllaw.com
ewhite@jgllaw.com
*Counsel for Plaintiffs*


THE HOLZMAN LAW FIRM

_____/s/_____
Lawrence Holzman – Federal Bar # 10751
199 E. Montgomery Ave, Ste 100,
Rockville, MD 20850
(301) 876-4393
lholzman@theholzmanlawfirm.com
*Counsel for Plaintiffs*
